**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

TYQUINE R. LEE, by and through is
Guardian, TAKEISHA L. BROWN,

    Plaintiff,

v.                                              Civil Action No. 3:19cv502

VIRGINIA DEPARTMENT OF
CORRECTIONS et al.,

    Defendants.

### MEMORADUM OPINION

Plaintiff Tyquine R. Lee ("Lee"), by and through his legal guardian and mother, Takeisha Brown, brings this action under 42 U.S.C. § 1983. ECF No. 1 ¶¶ 8-9.[1] This matter is before the Court on DEFENDANT EVERETT MCDUFFIE, M.D.'S MOTION TO TRANSFER (ECF NO. 38) and Defendants' MOTION TO TRANSFER VENUE (ECF NO. 40) (the "Transfer Motions"). For the reasons set forth below, the Transfer Motions will be granted and the case will be transferred to the Western District of Virginia.

### I. SUMMARY OF THE PERTINENT ALLEGATIONS

Lee is a 26-year-old inmate currently incarcerated within the Virginia Department of Corrections. Compl. ¶ 8. Lee was placed

---

[1] 42 U.S.C. § 1983 affords no substantive rights. It merely provides a procedural vehicle for suing in federal court for violation of federal rights by persons acting under color of state law. See Amato v. City of Richmond, 875 F. Supp. 1124, 1132 (E.D. Va. 1994) (citing Albright v. Oliver, 114 S. Ct. 807, 811 (1994)).

in solitary confinement on May 26, 2016 at Red Onion State Prison ("Red Onion") and remained in solitary confinement for over 600 days.  Id. ¶ 1.  As a result of his confinement, it is alleged that Lee "experienced a complete mental and physical collapse." Id.  Lee asserts that the Defendants "denied him urgently needed heath care" and allowed Lee "to deteriorate until he lost the ability to communicate coherently."  ECF No. 45 at 1.  Red Onion is located in the Western District of Virginia.

On October 21, 2019, the Court directed the parties to "brief their position on the propriety of transferring the present action to the Western Direct of Virginia pursuant to 28 U.S.C. § 1401(a)" in light of the decision in Nicholas Reyes v. Harold Clarke, et. al., Civil Action No. 3:-18cv611.  ECF No. 30 at 1-2.  On November 11, 2019, the Defendants filed the Transfer Motions.  Thereafter, Lee filed a consolidated reply (ECF No. 45).  Accordingly, the Transfer Motions are ripe for review.

## A. Alleged Acts and Omissions of the Defendants and the Defendants' Places of Residence

### 1. Virginia Department of Corrections

The Virginia Department of Corrections ("VDOC") is the executive agency responsible for operating and maintaining correctional facilities within Virginia.  Compl. ¶ 10.  VDOC "provides supervision and control over state correctional facilities and their programs," which issue "regulations,

2

policies, directives, and operating procedures governing the operation to state correctional facilities." Id. VDOC is required by statute to maintain a clinical treatment program for certain prisoners within its custody. Id. VDOC has its regular place of business in Richmond, Virginia. Id.

### 2. Henry J. Ponton

Henry J. Ponton ("Ponton") is the VDOC Regional Operations Chief for the Western District. Compl. ¶ 11. Ponton has ultimate authority over decisions made by the Dual Treatment Team ("DTT"), "which reviews solitary confinement classifications and mental health assessments to determine appropriate housing." Id. Ponton has also been a member of the External Review Team ("ERT"), which reviews the decisions of the DTT. Id. Ponton is being sued in his individual and official capacity. His regular place of business is in Roanoke, Virginia. Id.

### 3. Denise Malone

Denise Malone ("Malone") is the Chief of Mental Health Services for the VDOC. Compl. ¶ 12. In this role, Malone is responsible for the supervision of all mental health clinical supervisors, "including the supervisors responsible for the provisions of mental health services at Red Onion." Id. Malone is "also responsible for VDOC mental health treatment and associated policies and procedures and for the appropriate classification of VDOC prisoners based on mental health needs."

3

Id.  Additionally, Malone is a member of the ERT and is responsible for handling grievance appeals, for approving mental health programs at VDOC institutions, and for supervising and administering disciplinary actions for Qualified Mental Health Professionals.  Id.  Malone is being sued in her individual and official capacity.  Id.  Her regular place of business is in Richmond, Virginia.  Id.

### 4. Jeffrey Kiser

Jeffrey Kiser ("Kiser") is the Warden of Red Onion, where "he has ultimate responsibility over the care and custody of the facility's prisoners' including Mr. Lee" and was previously the Assistant Warden of Red Onion.  Compl. ¶ 13.  As Warden, Kiser has the ultimate authority to approve—or delegate authority to approve—security-level classification of the facility's prisoners. Id.  Kiser is sued in his individual and official capacity.  Id. His principal place of business is at Red Onion in Pound, Virginia. Id.

### 5. Earl Barksdale

Earl Barksdale ("Barksdale") is the former Warden of Red Onion.  Compl. ¶ 14.  As Warden, Barksdale "had ultimate responsibility over the care and custody of the facility's prisoners, including Mr. Lee."  Id.  Barksdale was also the Facility Unit Head of Red Onion, in which he had the ultimate authority to approve—or delegate authority to approve—security-

4

level classifications of the facility's prisoners.  Id.  Barksdale is sued in his individual and official capacity.  Id.  His regular place of business is at Baskerville Correctional Center in Baskerville, Virginia.  Id.

### 6. Arvil Gallihar

Arvil Gallihar ("Gallihar") is the Chief of Housing and Programs for Red Onion and has served on the DTT.  Compl. ¶ 15. Gallihar is sued in his individual and official capacity.  Id. His regular place of business is at Red Onion in Pound, Virginia. Id.

### 7. Amee B. Duncan

Amee B. Duncan ("Duncan") is the former Unit Manager of C-Building at Red Onion, where Lee was housed from January 2017 to January 2018.  Compl. ¶ 16.  In this role, Duncan reviewed segregation classification decisions made by the Institutional Classification Authority ("ICA"), "a team of staffers who conduct hearings to review the progress of individual prisoners through the Step-Down Program as well as their ongoing segregation classification."  Id.  Duncan is sued in her individual and official capacity.  Id.  Her regular place of business is at Red Onion in Pound, Virginia.  Id.

### 8. Larry Collins

Larry R. Collins ("Collins") is a Unit Manager at Red Onion and Facility Unit Head designee.  Compl. ¶ 17.  In this role,

Collins reviews segregation decisions made by the ICA.   Id.
Collins is sued in his individual and official capacity.   Id.   His
regular place of business is at Red Onion in Pound, Virginia.   Id.

### 9.  Walter Swiney

Walter Swiney ("Swiney") is a Unit Manager at Red Onion and
Facility Unit Head designee, "in which role he reviews segregation
decisions made by the ICA."   Compl. ¶ 18.   Swiney is sued in his
individual and official capacity.   Id.   His regular place of
business is at Red Onion in Pound, Virginia.

### 10.  Michael Younce

Michael Younce ("Younce") is a Unit Manager at Red Onion and
Facility Unit Head Designee.  Compl. ¶ 19.   In this role, Younce
reviews segregation decisions made by the ICA.   Id.   Younce is
sued in his individual and official capacity.   Id.   His regular
place of business is at Red Onion in Pound, Virginia.   Id.

### 11.  Justin W. Kiser

Justin W. Kiser is a "former ICA member at Red Onion,
responsible for reviewing and recommending" Lee's segregation
classification.   Compl. ¶ 20.   Justin Kiser is sued in his
individual and official capacity.   Id.   His last known regular
place of business is at Red Onion in Pound, Virginia.   Id.

### 12.  Roy Sykes

Roy Sykes ("Sykes") is an ICA member at Red Onion,
"responsible for reviewing and recommending [Lee's] segregation

classification." Compl. ¶ 21.  Sykes is sued in his individual and official capacity.  Id.  His last known regular place of business is at Red Onion in Pound, Virginia.  Id.

### 13.  Gary Adams

Gary Adams ("Adams") is a former ICA member at Red Onion, "responsible for reviewing and recommending [Lee's] segregation classification."  Compl. ¶ 22.  Adams is sued in his individual and official capacity.  Id.  His last known regular place of business is at Red Onion in Pound, Virginia.  Id.

### 14.  James D. Lambert

James D. Lambert ("Lambert") is an ICA member at Red Onion, "responsible for reviewing and recommending [Lee's] segregation classification."  Compl. ¶ 23.  Lambert is sued in his individual and official capacity.  Id.  His regular place of business is at Red Onion in Pound, Virginia.  Id.

### 15.  Terrence Huff

Terrence Huff ("Huff") is a Qualified Mental Health Profession and VDOC employee.  Compl. ¶ 24.  Huff is sued in his individual and official capacity.  Id.  His regular place of business is at Red Onion in Pound, Virginia.  Id.

### 16.  D. Trent

D. Trent ("Trent") is a Qualified Mental Health Professional and VDOC employee.  Compl. ¶ 25.  Trent is sued in his individual

and official capacity.  Id.  His regular place of business is at Red Onion in Pound, Virginia.  Id.

### 17.  Everett McDuffie

Everett McDuffie ("McDuffie") is a psychiatrist.  Compl. ¶ 26.  McDuffie contracts with the VDOC to provide psychiatric services to prisoners at Red Onion.  Id.  McDuffie is sued in his individual capacity.  Id.  He maintains a regular place of business at Red Onion.  Id.

### B. Solitary Confinement and the Step-Down Program

When deciding the Transfer Motions, the Court is obligated to accept, as true, all well-pleaded, non-conclusory factual allegations.  The Complaint is quite specific and the factual allegations recited herein are accorded the respect called for in analyzing the Motions to Transfer.

Red Onion is a supermax prison located in Pound, Virginia. Compl. ¶ 27.  Red Onion is "designed to impose an environment of complete isolation and control, including the placement of hundreds of its prisoners in solitary confinement."  Id.

### 1. VDOC Policies Regarding Medical Care for Prisoners in Solitary Confinement

The Complaint alleges that "Defendants' inaction in the face of [Lee]'s severe mental illness was contrary to VDOC policies." Compl. ¶ 65.  VDOC policy requires the "[a]ctive screening, monitoring and proactive management of prisoners who are at risk

8

of deteriorating in solitary confinement." Id. Specifically, VDOC Operating Procedures require that:

> a. Offenders should be screened by a Qualified Mental Health Professional(QMHP) before their placement or within one working day after placement in special housing so any "at risk" offenders may be identified.
> VDOC Operating Policy 720.1, § IV.C.
> b. Institutions "systematically identify, monitor, and manage offenders" who are at risk of deterioration. VDOC Operating Policy 730.5, § IV.C.1.
> c. QMHP should recommend removal from solitary confinement if "that placement . . . may have a deleterious effect on an offender's mental health." VDOC Operating Policy 730.5, § IV.C.1.
> d. Offenders with serious mental illnesses must be moved out of solitary confinement within 28 days and placed in one of four housing options designed to provide mental health care. VDOC Operating Procedure 861.3 § IV.B.4.
> e. Any offender with identified mental health problems who is placed in special housing should be monitored according to specified health service procedures. VDOC Operating Procedure 861.3 § V.C.2.
> f. No offender will be denied necessary or proper medical, dental, or mental health care while in special housing. VDOC Operating Procedure 861.3 § V.C.4.
> g. A QMHP will personally interview any offender remaining in special housing for more than 30 days, and if confinement continues for more than 30 days, any offender with an identified mental health need shall receive an assessment at least once a month, or more frequently if prescribed by the Health Authority. VDOC Operating Procedure 861.3 § V.C.12.

Id.  The Complaint asserts that, in practice, the mental health screenings and evaluations at Red Onion are cursory and ineffective.  Id. ¶ 66.

### 2. The Step-Down Program

In 2011, the VDOC implemented a Step-Down Program meant to allow prisoners in solitary confinement "to earn privileges and eventually work their way out of solitary by completing a series of assignments." Compl. ¶ 76.  Under the Step-Down Program, there are two pathways: Intensive Management ("IM") and Special Management ("SM").  Id. ¶ 78.  For those in the SM track of the program, such privileges "may eventually include a return to general population." Id.  However, for prisoners, such as Lee, in the IM track, there is no possibility of returning to general population.  Id.  "Irrespective of the track, prisoners in solitary confinement who wish to earn additional privileges must, among other requirements, complete the so-called 'Challenge Series.' That series consists of seven workbooks which prisoners must complete."  Id.

VDOC policy requires "a due process hearing by the Institution Classification Authority (ICA) prior to placement in solitary confinement and reviews by the ICA of the prisoner's status every 90 days."  Id. ¶ 77.  The role of the ICA is

> to review the progress of prisoners through
> the Step-Down Program as well as their·on
> going segregation classification.  A reporting

> staff member makes a recommendation as to
> whether a prisoner should be retained in
> solitary confinement. The ICA then conducts
> an internal review of the staff member's
> recommendation before adopting it. All
> interim segregation reviews are also reviewed
> by the Facility Unit Head or his or her
> designee.

Id. ¶ 82. In addition to review by the ICA,

> at least three other administrative bodies
> have a role in reviewing a prisoner's status.
> The Building Management Committee, comprised
> of mental health and correctional staff with
> direct knowledge of the prisoners in their
> custody, makes recommendations to the ICA
> regarding assignment of prisoners to privilege
> levels. There is also a Dual Treatment Team
> (DTT), responsible for reviewing solitary
> confinement classifications and making
> recommendations as to whether prisoners are
> properly classified, and a biannual External
> Review Team (ERT), which reviews the decisions
> of the DTT.

Id. ¶ 83. According to Lee, although the VDOC established

procedures for reviewing an inmate's solitary confinement status,

these reviews, in practice, "are little more than rubber stamps"

and do not record a prisoner's progress through the Step-Down

Program. Id. ¶ 77. Additionally, Lee asserts that the VDOC Step-

Down Program "failed to make any accommodations for mentally ill

prisoners like Mr. Lee, who became incapable of effectively

communicating verbally or in writing when his placement in solitary

confinement exacerbated his mental illness. Rather than providing

Mr. Lee with a pathway out of solitary confinement, the program

became an obstacle that he could not hope to overcome." ECF No. 45 at 2.

## C. Conditions of Confinement Specific to Lee

In October 2011, Lee was convicted of a series of armed robberies. Compl. ¶ 47. Following his sentencing for the robberies, Lee was initially held at Powhatan Reception and Classification Center and later transferred to Sussex I State Prison. Id. ¶ 49. On September 18, 2015, Lee was transferred to Red Onion. Id. On May 26, 2016, following an e-mail intercepted from Lee that was interpreted as a threat towards a correctional officer at another facility, Lee was placed in solitary confinement. Id. ¶ 50.

While in solitary confinement

> Prisoners are supposed to be taken to shower
> three times a week and allowed one hour of
> recreation five times a week. During
> recreation, prisoners are alone in a cage the
> size of a parking space. A prisoner must
> submit to a body cavity search before leaving
> his cell, and during the brief time he is
> allowed out, he is shackled and escorted by
> two guards. Besides infrequent medical exams,
> these interactions with guards are the only
> time a prisoner is solitary confinement will
> feel the touch of another human being.

Id. ¶ 30. Lee asserts that, despite these guidelines, during his time in solitary confinement, he almost never left his cell. Further, Lee alleges that:

> There were periods when the guards only took
> him to shower once a month, and he spent an

12

hour in the recreation cage only once every
two to three weeks. On occasions when he was
allowed a phone call, guards would bring an
ear piece to his cell instead of taking him to
the phone, and often the ear piece did not
work. He did not have any out-of-cell visits
with medical personnel; any check-ups were
brief encounters through the cell door.   The
limited human contact that Mr. Lee had was
often   hostile.   Correctional   officers
responded to Mr. Lee's symptomatic behavior by
trying   to   provoke   him   with   threatening
language   and   subduing   him   with   chemical
agents. Correctional officers maced Mr. Lee
approximately   25   times   during   his
incarceration   in   solitary   confinement   in
response to Mr. Lee's complaints the food, the
filthiness   of   his   cell,   and   other   intense
frustrations of life in solitary confinement.
Mr. Lee became fearful of the correctional
officers,   and   during   one   visit   with   his
Mother, Mr. Lee told her to stop asking
questions about his well-being, because it
would cause the guards to retaliate.   Prison
employees delivered Mr. Lee's meals through a
slot in the door and ate alone in his cell,
like   all   other   prisoners   on   solitary
confinement in Red Onion. The food was often
inedible, and sometimes infested with dirt,
insects,   and   maggots.   Other   times   guards
neglected to give him anything to eat. During
his time in solitary confinement, Mr. Lee
weight dropped from 174 to 140 pounds.

Id. ¶ ¶ 30-33.   Additionally, during his solitary confinement,

human interaction inside the prison was reduced to a bare minimum

and   Lee's   contacts   with   the   outside   world   were   severely

constrained.   Id. ¶ 35.

### D. Lee's Deteriorating Mental Health

Lee "has suffered from mental illness since childhood. He was

diagnosed with ADHD at the age of five and placed on medication.

13

Social Security records identify Mr. Lee as 'disabled,' with his disability beginning at the age of eight. From the ages of eight to ten, he was hospitalized four times for behavior associated with his mental illness." Compl. ¶ 46. Lee's mental illness allegedly led to behavior problems, including his criminal activity. Id. ¶ 47.

Within two months of his placement in solitary confinement, Lee began exhibiting psychotic symptoms. Id. ¶ 51. Namely, Lee began:

> speaking in numbers. Whereas previously he showed no difficulty in signing his name, on a July 22, 2016 ICA Hearing Notification Form, Mr. Lee's signature was a nonsensical string of letters. He signed the same type of form in the same manner on November 27, 2017, this time adding below the signature line an incoherent list of numbers and random words. Rather than recognize this writing as a sign of severe mental illness, a Red Onion official simply wrote "Refused to sign" across the top of the signature line.

Id. Despite these symptoms, Lee was held in solitary confinement without any mental health treatment from May 2016 to January 2018, for a total of twenty months. Id. ¶ 52. Lee's "descent into psychosis was precipitated and dramatically worsened by his confinement at Red Onion." Id.

The impact of solitary confinement on Lee's mental illness was allegedly made worse by the misconduct of the officers and staff at Red Onion. Id. ¶ 54. On January 17, 2017, Lee received

14

a disciplinary infraction for "refusal to submit to a drug test" and was penalized by being unable to have visitors for six months. Id. ¶ 55.

On January 17, 2018, the ICA recommended Lee be transferred to a different facility. Id. ¶ 58. An evaluation conducted later in January revealed that Lee's mental health had significantly deteriorated. Id. "Dr. McDuffie diagnosed Mr. Lee with schizophrenia and an unspecified personality disorder, and recommended placement at Marion Correctional Treatment Center ("MCTC")." Id. Following this recommendation, on January 31, 2018, Lee was transferred to MCTC and underwent an intake interview the following day, in which it was "observed that [Lee] had lost all sense of his own identity, his family, or his present circumstances. He did not understand why he had been transferred to MCTC." Id. ¶ 60. Evaluations conducted in the following weeks revealed that Lee's mental health had significantly deteriorated. Id. Many of the harms Lee suffered as a result of his solitary confinement, including his "spontaneity of speech" persisted "long after [Lee] transferred out of Red Onion." Id. ¶ 62.

Lee's mental health "eventually began to improve as a result of the treatment he received at [MCTC]." Id. ¶ 94. Lee was transferred to Greensville Correctional Center ("Greensville"), where he was in general population and in conditions beneficial to Lee's mental health." Id. However, following a dispute with

15

another inmate at Greensville, Lee was transferred to Wallens Ridge
State Prison ("Wallens Ridge"), where his mental health has
continued to decline. Id. ¶ 95. The Complaint asserts that:

> absent the level of medical care necessary to
> manage his condition, Mr. Lee's mental illness
> is very likely to lead to behavioral issues.
> VDOC's policy and practice, as implemented
> both at Red Onion and Wallens Ridge, is to
> respond to behavioral issues by placing
> prisoners in solitary confinement, even when
> the behaviors are the result of mental
> illness. As a result, it is nearly certain
> that absent prospective relief by this Court,
> Mr. Lee will be placed in solitary confinement
> again in the future. Lee cannot be placed in
> solitary confinement without a substantial
> risk of a serious deterioration of his mental
> health.

Id. ¶¶ 96-98.

### E. Lee's Claims

Lee alleges that the "Defendants systematically failed to
meaningfully implement VDOC programs and policies that should have
afforded [Lee] periodic reviews of placement in solitary
confinement" and that "[t]he harms that [Lee] suffered were greatly
exacerbated as a result." Compl. ¶ 75. Lee raises the following
causes of action in his Complaint.

### 1. Count I: Violation of the Eighth Amendment of the United State Constitution- Conditions of Confinement

Lee alleges that Defendants Ponton, Malone, Kiser, Barksdale,
Gallihar, Duncan, Collin, Swiney, Younce, Justin Kiser, Sykes,
Adams, Lambert, Huff, and Trent, in their individual and official

capacities, and McDuffie, in his individual capacity, deprived him of "the minimal civilized measure of life's necessities, including by holding him for over 600 days in conditions that destroyed his physical and psychological health." Compl. ¶ 100. Specifically, Lee asserts that his solitary confinement at Red Onion caused "an ongoing mental health crisis that precipitated his extreme physical and mental deterioration. The harm continued long after his release from Red Onion and may be permanent. Mr. Lee requires ongoing pharmacological intervention in a treatment setting." Id. ¶ 101.

As to each Defendant, Lee further alleges that each "was individually aware that long-term solitary confinement causes and exacerbates mental illness. Nevertheless, Defendants held Mr. Lee in solitary confinement despite the obvious and devastating consequences to Mr. Lee's mental and physical health." Id. ¶ 102.

### 2. Count II: Violation of the Eighth Amendment of the United States Constitution-Failure to Provide Medical Care

The Complaint alleges that, "Almost immediately after his placement in solitary confinement, Mr. Lee began to display symptoms of serious mental illness that required medical treatment. Mr. Lee's condition amounted to a serious medical need that was so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Compl. ¶ 113. Accordingly, Lee contends that Defendants Malone, Kiser,

17

Barksdale, Huff, and Trent, in their individual and official capacities, and McDuffie, in his individual capacity,

> acted with deliberate indifference to [Lee's] serious medical needs by failing to provide him with any treatment whatsoever for over 600 days, and by failing to take any steps to effectuate his release from solitary confinement, during which time Mr. Lee's physical and mental health completely deteriorated.

Id. ¶ 114.

### 3. Count III: Violation of Procedural Due Process Rights Under the Fourteenth Amendment to the U.S. Constitution

Lee asserts that he:

> has a protected liberty interest in avoiding continued prolonged and indefinite solitary confinement. This liberty interest arises from (1) the VDOC regulations mandating periodic review of long-term segregation status, including the Segregation Reduction Step-Down Program and VDOC Operating Procedure 830.A, and (2) the conditions of Mr. Lee's confinement, which cause atypical and significant hardship in comparison to the general prison population.

Compl. ¶ 122. Accordingly, Lee alleges that Defendants Ponton, Malone, Kiser, Barksdale, Gallihar, Duncan, Collins, Swiney, Younce, Justin Kiser, Sykes, Adams, and Lamber, in their individual capacities

> failed to provide meaningful proceedings to determine the continued propriety or necessity of Mr. Lee's solitary confinement. Defendants failed to articulate any legitimate basis to Mr. Lee for why he remained in solitary confinement and failed to provide him a

18

> meaningful opportunity to contest his placement. Instead, Defendants rubberstamped decisions to retain Mr. Lee in solitary confinement via rote repetition without providing a reasoned decision based on Mr. Lee's current level of risk or assessment of his mental health. Far from providing due process, these reviews were no more than a pretext for Mr. Lee's indefinite detention in solitary confinement.

Compl. ¶¶ 124.

### 4. Count IV: Violation of the Americans with Disabilities Act

Lee states that "[h]is serious mental illness, even when mitigated through medical treatment, constitutes a mental impairment that substantially limits him in several major life activities, including but not limited to learning, reading, concentrating, thinking, communicating, and interacting with others." Compl. ¶ 133. Lee alleges that the VDOC

> failed to accommodate Mr. Lee's mental disabilities and denied him the benefits and services of their facilities by reason of his mental disability by, among other things, holding Mr. Lee in solitary confinement for over 600 days despite and because of his mental impairment, failing to provide him alternate means to progress out of solitary confinement, and failing to account for his disability in period reviews of his placement in solitary confinement.

Id. ¶ 135.

### 5. Count V: Violation of the Rehabilitation Act of 1973

Lee alleges that the VDOC

19

> [v]iolate[d] the Rehabilitation Act by
> discriminating against Mr. Lee solely on the
> basis of his disability. VDOC fails to
> reasonably accommodate Mr. Lee's disability
> by, among other things, holding Mr. Lee in
> solitary confinement for over 600 days despite
> and because of his mental impairment, failing
> to provide him alternate means to progress out
> of solitary confinement, and failing to
> account for his disability in period reviews
> of his placement in solitary confinement.

Compl. ¶ 141.

### 6. Count VI: Medical Malpractice

Lee states that:

> The applicable standard of care is Virginia
> requires, at a minimum, that treating medical
> professionals avoid significant delay in the
> onset of treatment for individuals exhibiting
> psychotic symptoms, because delay increases
> the likelihood that the individual's baseline
> functioning will have deteriorated to the
> point that the possibility of optimal recovery
> is severely limited.

Compl. ¶ 147.  Based on this standard, Lee alleges that Defendants

Trent, Huffy and McDuffie failed:

> to provide any medical treatment, medication,
> referral for further evaluation, or
> recommendation for a transfer out of solitary
> confinement for a period of a year and a half,
> during which time Mr. Lee was exhibiting
> severe symptoms of mental illness, constitutes
> grossly negligent and/or wanton and reckless
> misconduct.

Id. ¶ 148.

### 7. Count VII: Intentional Infliction of Emotional Distress

Lee asserts that Defendants Ponton, Malone, Kiser, Barksdale, Gallihar, Duncan, Collins, Swiney, Younce, Justin Kiser, Sykes, Adams, Lambert, Huff, Trent, and McDuffie

> individually and collectively, in holding Mr. Lee in solitary confinement for over a year and a half was intentional and/or reckless, and constitutes behavior so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

Compl. ¶ 151.

## II. STANDARD FOR DECIDING THE TRANSFER MOTIONS

28 U.S.C. § 1404(a), which permits the transfer of civil actions, provides that:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.

To determine whether a § 1404(a) transfer of venue is appropriate, "a district court must make two inquiries: (1) whether the claims might have been brought in the transferee forum, and (2) whether the interest of justice and convenience of the parties and witnesses justify transfer to that forum." Koh v. Microtek Int'l, Inc., 250 F. Supp. 2d 627, 630 (E.D. Va. 2003); see also

Seaman v. IAC/InterActiveCorp, Inc., No. 3:18-cv-401, 2019 WL 1474392, *3 (E.D. Va. Apr. 3, 2019).

The party seeking transfer of venue bears the burden of showing that the transfer is warranted. Beam Laser Sys., Inc. v. Cox Commc'ns, Inc., 117 F. Supp. 2d 515, 518 (E.D. Va. 2000) (citation omitted}. However, "[t]he transfer of a case can be accomplished *sua sponte*." Am. Int'l Specialty Lines Ins. Co. v. A.T. Massey Coal Co., 628 F. Supp. 2d 674, 685 (E.D. Va. 2009) (citing Jensen v. Klayman, 115 F. App'x 634, 635-36 (4th Cir. 2004)). Once a court determines that transfer is possible, the court must "consider and balance" four factors to determine whether transfer is warranted: "(1) the weight accorded to plaintiff's choice of venue; {2} witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." Trs. Of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc., 791 F.3d 436, 444 (4th Cir. 2015) (citations omitted). Ultimately, "[t]he decision whether to transfer an action pursuant to § 1404(a) 'is committed to the sound discretion of the district court.'" BHP Int'l Inv. Inc. v. OnLine Exch., Inc., 105 F. Supp. 2d 493, 498 (E.D. Va. 2000} (quoting Verosol B.V. v. Hunter Douglas, Inc., 806 F. Supp. 582, 591 (E.D. Va. 1992)).

## A. The Action Could Have Been Brought in the Western District of Virginia

The first step of the transfer analysis, which requires that both venue and jurisdiction with respect to each defendant be proper in the putative transferee district, looks to whether the action could have originally been brought in the Western District of Virginia. Koh, 250 F. Supp. 2d at 630; Hengle, 2018 WL 3016289, at *5. Neither party disputes that the case could have been brought in the Western District.

## B. The Section 1404(a) Factors Weigh in Favor of Transfer

In the second step of the § 1404(a) transfer analysis, a court must weigh the following factors: "(1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." Trs. of the Plumbers & Pipefitters Nat. Pension Fund, 791 F. 3d at 444 (citations omitted). On balance and considering these factors, the § 1404(a) analysis supports transfer to the Western District of Virginia.

### 1. Lee's Choice of Forum

"As a general rule, a plaintiff's 'choice of venue is entitled to substantial weight in determining whether transfer is appropriate.'" Trs. of the Plumbers & Pipefitters Nat. Pension Fund, 791 F. 3d at 444 (quoting Bd. of Trs. v. Sullivant Ave. Props., LLC, 508 F. Supp. 2d 473, 477 (E.D. Va. 2007)). "But, if

23

the plaintiff's choice of forum is neither the nucleus of operative facts nor the plaintiff's home forum, the plaintiff's choice is accorded less weight." Seaman v. IAC/InterActiveCorp, Inc., No. 3:18-CV-401, 2019 WL 1474392, at *4 (E.D. Va. Apr. 3, 2019) (citing Intranexus, Inc. v. Siemens Med. Sols. Health Servs. Corp., 227 F. Supp. 2d 581, 583 (E.D. Va. 2002)).

Lee's home forum is in the Eastern District. For purposes of venue, "a person is a resident only where he is a citizen and domiciled, or where he makes his home; residence does not arise out of a transitory abode or out of a temporary sojourn in a place other than that of residence or domicile." Koh v. Microtek Int'l Inc., 250 F. Supp. 2d 627, 634 (E.D. Va. 2003). For a prisoner, "A rebuttable presumption exists that a prisoner does not acquire a new domicile in the state of his incarceration, but retains the domicile he had prior to his incarceration." Goad v. Gray, No. 3:10cv326, 2010 WL 4735816, at *1 (E.D. Va. Nov. 15, 2010) (citations omitted). Before he was incarcerated, Lee lived in Portsmouth, Virginia with his mother and sister. ECF No. 45 at 3. Thus, the Eastern District is Lee's home forum and Lee's choice of forum should be given weight.

On the other hand, while the Eastern District is Lee's home forum, it is clear that the Western District of Virginia is the "nucleus of operative facts." Defendants maintain that Lee's Complaint bears little relation to the Eastern District of

24

Virginia.  ECF No. 39 at 7.  In response, Lee attempts to frame the Complaint not as an attack on "how the [Step-Down] program was applied at Red Onion" but "deficiencies in the [VDOC's] policy itself" as formulated and deployed in the Richmond.  ECF No. 45 at 9.  But Lee's argument is a failing one.  Similar to the claims in Reyes, Lee's constitutional and statutory claims

> do not rest only, or even heavily, upon facial challenges to Defendants' policies that may have been formulated in the Eastern District of Virginia. Instead, the nucleus of operative facts for Reyes' claims relies extensively upon the specific misconduct of Defendants and other individuals in the Western District of Virginia.

Reyes v. Clarke, No. 3:18cv611, 2019 WL 4195344, at *10 (E.D. Va. Sept. 4, 2019).

As the Defendants point out, "the Complaint includes allegations about all aspects of [Lee's] incarceration at Red Onion, including treatment from correctional officers, the food, the lack of human interaction, the lack of sensory and mental stimulation, the lack of out-of-cell programming, and the lack of mental health treatment."  ECF No. 39 at 10.  For example, Lee's Eighth Amendment claims relies on Defendants Malone, Kiser, Barksdale, Huff, Trent, and McDuffie's allegedly deliberate acts of indifference to Lee's serious mental health needs, actions which occurred entirely within the Western District of Virginia.  Compl. ¶¶ 112-119.

Lee's Eighth Amendment and Fourteenth Amendment claims based on his solitary confinement do not rest upon a facial reading of the VDOC regulations that were approved in Richmond but focus on the conditions of solitary confinement specific to Lee at Red Onion.  As the Court previously pointed out,

> Although supervisory officials in the Eastern District of Virginia ultimately may bear some liability for allegedly inadequate oversight, the nucleus of operative facts for those claims rests squarely in the Western District of Virginia.

Reyes, 2019 WL 4195344, at * 11.   The allegations within the Complaint are premised on the individual actions of the Defendants, not on the deficiencies in the VDOC policy as a whole.   Thus, the nucleus of operative facts that form the basis for Lee's claims is the Western District.   Given the pleadings, Lee's choice of forum is entitled to some deference because his home forum is the Eastern District but must be accorded less weight because the material events underlying the Complaint occurred entirely within the Western District of Virginia.

### 2. Witness Convenience

The second factor of the § 1404(a) analysis focuses on the convenience to the witnesses testifying at a trial.   The convenience of witnesses is of considerable importance when considering a transfer, especially the convenience of nonparty witnesses, whose location should be afforded greater weight in

26

deciding a motion to transfer venue. See Fitzgibbon v. Radak, No. 3:18-cv-247, 2019 WL 470905, at *4 (E.D. Va. Feb. 6, 2019}; Koh, 250 F. Supp. 2d at 636-37. The party asserting witness inconvenience must offer sufficient details respecting the witnesses and their potential testimony, "by affidavit or otherwise," to enable the Court to assess the materiality of evidence and the degree of inconvenience. Koh, 250 F. Supp. 2d at 636. In other words, generally, "the influence of this factor cannot be assessed in the absence of reliable information identifying the witnesses involved and specifically describing their testimony." Bd. of Trs., Sheet Metal Workers Nat'l Fund v. Baylor Heating & Air Conditioning, Inc., 702 F. Supp. 1253, 1258 (E. D. Va. 1988). To satisfy the burden that a forum is inconvenient for witnesses, generally the party seeking the transfer must provide particularized information of a witness' potential testimony, how that testimony is material and non-cumulative, or the degree to which it will be inconvenient to access that testimony in the present district. See Koh, 250 F. Supp. 2d at 636.

The Defendants, who aim to transfer case to the Western District, represent that they have compiled a list of potential non-party witness to the action, and that the "majority of witnesses work and/or reside in the Western District of Virginia,

27

which would be a more convenient forum than the Eastern District of Virginia." ECF No. 39 at 11; ECF No. 41 at 4-8.

In support of their request to transfer, the Defendants have submitted the affidavit of Defendant Ponton, the Western Regional Operations Chief for the Western District of the VDOC. See generally ECF No. 41-2. Initially, Ponton notes that, "[Red Onion], which is located in Pound, Virginia, is located approximately 368 miles from the federal district courthouse in Richmond, Virginia. It is 59 miles from the federal district courthouse in Abingdon, Virginia." Id. ¶ 4. Ponton states that, "[o]f the sixteen named defendants, nine (9) are currently employed by or at [Red Onion]." Id. ¶ 9. In addition, "the twenty [Red Onion] employees who have been identified as potential witnesses include the ROSP institutional investigator, both institutional hearings officers, the assistant warden, the operations manager, the grievance coordinator, and numerous members of the ROSP medical, administrative, and security staff." Id. ¶ 12. Posner further declares, in pertinent part, that

> If this matter were to proceed to trial, the prolonged absence of the nine named defendants, alone, would be incredibly disruptive to the operation of ROSP, which is a maximum-security level facility that houses approximately 778 inmates. When also considering the absence of the non-party witnesses, the disruption to the operations of ROSP would be magnified. If a significant number of ROSP employees were compelled to be absent from this facility, over a period of

28

several days, in order to testify at a jury trial in Richmond, ROSP would need to take extraordinary steps to ensure the continuing safety and security of this facility.

Specifically, the absence of that number of employees would result in the prison being critically understaffed. ROSP would be compelled to either transfer a portion of its current inmate population to other VDOC facilities, and/or bring in correctional officers and employees from other VDOC facilities to help staff the prison.

Finally, if any ROSP inmates were identified as potential witnesses in this action, transporting those inmates to Richmond for purposes of trial would also present logistical issues, the severity of which would vary depending upon the number of inmates called to testify. Considering the distance between ROSP and the federal courthouse in Richmond, any testifying inmates would need to be transported to the Richmond area the day before trial, and temporarily placed at a facility that could safely house level "S" inmates. For the reasons discussed in paragraph 16, temporarily transferring level "S" inmates presents logistical difficulties, which would be amplified in the potential absence of enough security officers to escort these inmates to the Richmond area. The transporting officers would be in addition to any ROSP staff members who would be called to testify at trial, and in addition to the number of officers who would need to be left behind to safely staff the prison. Additional logistical concerns include the possible need to house inmate witnesses at multiple separate facilities, depending upon their security levels and any "enemy" declarations in their inmate records.

For these reasons, if this case were to proceed to a jury trial, and if that trial were held in Richmond, the resulting staffing shortage at ROSP, caused by the absence of the parties and witnesses, would critically undermine the safety and security of that prison. Similar security concerns would exist

> at WRSP, and the provisions of mental health
> services at MCTC could be gravely impacted.
> Considering the many logistical difficulties
> posed by trying a case of this nature over 350
> miles away from the prison, a Richmond trial
> would impose a significant burden on not just
> the named ROSP defendants, but would also
> greatly strain any remaining ROSP staff and
> would deplete overall prison resources.

Id. ¶¶ 13-14, 18, 21 (internal paragraph numbers omitted).

Posner also notes that the above problems would not occur if
the matter was tried in the Western District of Virginia. That is
somewhat of an overstatement but the problems would be considerably
less in the Western District of Virginia because:

> These same logistical concerns would not be
> present if this case were tried in the federal
> courthouse in Big Stone Gap, or even in
> Abingdon. Considering the close proximity of
> ROSP. WRSP, and MCTC to those courthouses, the
> prison would be to rotate shifts and allow for
> the temporary absence of employees who might
> need to appear in court to testify. Also, ROSP
> and WRSP are accustomed to transporting
> inmates back and forth to those courthouses to
> testify and no relocation or reassignment
> would be required in order to bring those
> witnesses to court for the purposes of
> testifying to the jury.

Id. 22.

Ponton's affidavit clearly shows great inconvenience to those
who would likely be called to testify. But, the Defendants have
not satisfied the requirement to provide particularized
information about the testimony of witnesses, and how that

30

testimony is material.[2]  That failing ordinarily would be fatal.
However, the Complaint is very specific and provides significant
information about the identity of key witnesses and the subjects
about which they would testify.  Under this unique circumstance,
the record here is sufficient to allow the assessment required by
the applicable law.  Therefore, in this case, the Defendants' error
is not fatal to the Transfer Motions.

    Lee's claims arise out of his solitary confinement while at
Red Onion.  It is likely that Lee, who is currently located within
the Western District of Virginia, will need to testify to support
these claims.  The burden of moving and housing inmates for the
duration of any trial falls on the Defendants.  Cf. Starnes v.
McGuire, 512 F.2d 918, 931 (D.C. Cir. 1974) ("The burdens and
dangers involved in transporting a prisoner across long distances
are, in our opinion, a significant inconvenience to the Bureau of
Prisons and will normally justify transfer.").  Further, in order
to defend the claims based on Lee's confinement, Defendants, as
they point out, will be required to call prison employees from Red
Onion and Wallens Ridge to defend against Lee's claims.  See Keitt
v. New York, No. 12 CIV. 2350 (PAE), 2013 WL 3479526, at *3
(S.D.N.Y. July 10, 2013} (finding that witnesses in a prison abuse

---

[2] Counsel must be familiar with the applicable law and must make
sure that their filings comply with it.  Failure to do that most
often results in the denial of motions of this sort.

suit were likely to be located at or near the correctional facilities where the abuse occurred). Given that the claims at hand involve a prolonged period of mistreatment, Defendants will be required to call a significant number of current and former prison employees in order to defend themselves.

The reasons stated with respect to witness convenience to maintain this matter in the Eastern District of Virginia do not outweigh the reasons favoring transfer to the Western District. First, the identified witnesses and Defendants who reside in in the Eastern District of Virginia do not object to traveling to the Western District to accommodate the other Defendants and witnesses. ECF No. 41-2 ¶ 23. Second, while it is clear that Richmond is the more convenient forum for Lee's sister, Lee's sister does not reside in Richmond and the other evidence before the Court strongly establishes that the Western District of Virginia will be the most convenient forum for the vast majority of witnesses. Accordingly, this factor weighs heavily in favor of transfer.

### 3. Convenience of the Parties

The Defendants, as movants, "must show (1) that the original forum is inconvenient for them and (2) that [the non-moving party] will not be substantially inconvenienced by the transfer." Seaman, 2019 WL 1474392, at *6 (citing Fitzgibbon, 2019 WL 470905 at *3; Koh, 250 F. Supp. 2d at 636).

32

The Defendants have demonstrated that they will be inconvenienced by conducting a trial in the Eastern District of Virginia. Based on the list of potential witnesses the Defendants have proffered, it appears that litigating this case would require significant shifting of VDOC resources at Red Onion to conduct a trial on this matter in the Eastern District of Virginia. Reyes, 2019 WL 4195344, at *13. Other than the longer trip for Lee's sister, Lee will not be inconvenienced by conducting the trial in the Western District of Virginia. Therefore, this factor strongly favors transfer to the Western District of Virginia.

### 4. The Interest of Justice

"The last factor for the Court to consider is 'the interest of justice,' which encompasses public interest factors aimed at 'systemic integrity and fairness.'" Seaman, 2019 WL 1474392, at *7 {quoting Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 30 {1988)). Judicial economy and the avoidance of inconsistent judgments are prominent among the principal elements of systemic integrity. See Fitzgibbon, 2019 WL 470905, at *4; U.S. Ship Mgmt., Inc. v. Maersk Line, Ltd., 357 F. Supp. 2d 924, 937-38 (E.D. Va. 2005). Other factors include "the pendency of a related action, the court's familiarity with the applicable law, docket conditions, access to premises that might have to be viewed, the possibility of unfair trial, the ability to join other parties, and the possibility of harassment." Koh, 250 F. Supp. 2d at 639.

Lee asserts that, "While there are other cases pending in the Western District against officials at Red Onion for its solitary confinement practices, the resolution of those cases will necessarily turn on the specific facts of each Plaintiff's circumstances." ECF No. 45 at 11. However, as the Court pointed out in Reyes, both the avoidance of inconsistent judgments and judicial economy favor transferring the action to the Western District of Virginia.

> In the decades that the undersigned has been sitting in Richmond, this Court has not ever issued a final judgment as to whether the conditions at Red Onion and the Step-Down Program pass constitutional muster. However, the United States District Court for the Western District of Virginia regularly addresses those issues. Thus, the possibility for inconsistent judgments respecting the constitutionality of the conditions at Red Onion and the Step-Down Program will be greatly reduced if this matter is transferred to the Western District of Virginia.

Reyes, 2019 WL 4195344, at *14.

Therefore, the interest of justice favors transfer to the Western District. Because the majority of the factors to be considered under § 1404(a) strongly favor transferring the matter to the Western District of Virginia, transfer to that forum is appropriate.

## III. CONCLUSION

For the reasons stated above, DEFENDANT EVERETT MCDUFFIE, M.D.'S MOTION TO TRANSFER (ECF NO. 38) and Defendants' MOTION TO

34

TRANSFER VENUE (ECF NO. 40) will be granted and this action will
be transferred to the Western District of Virginia.[3]

It is so ORDERED.

_____/s/_____ _R&P_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  April  20, 2020

---

[3] The judges of that Court will decide which division of the Court
should be the appropriate place for assignment.

The various motions (ECF Nos. 13, 15, 22, and 35) are best
resolved by the transferee court.